# OPERATING AGREEMENT
## PLANT-BASED PIZZA NEW YORK LLC
### A New York Limited Liability Company

This Operating Agreement of PLANT-BASED PIZZA NEW YORK LLC (the "**Agreement**"), dated as of November **11**, 2015 (the "**Effective Date**"), is (a) agreed to and adopted by the Manager (as defined below) and (b) executed and agreed to, for good and valuable consideration, by the Members (as defined below in Exhibit A), and which supersedes and replaces any prior version of the operating agreement.

## ARTICLE 1
## DEFINITIONS

1.01    **Definitions.** As used in this Agreement, the following terms shall have the respective meanings as indicated below:

"**Adjusted Capital Account**" - a Capital Account determined and maintained for each Member, the balance of which shall be equal to such Member's Capital Account balance, modified as follows:

(a)     increased by the amount, if any, of such Member's share of the Minimum Gain of the Company as determined under Treasury Regulation Section 1.704-2(g)(1);

(b)     increased by the amount, if any, of such Member's share of the Minimum Gain attributable to Member Nonrecourse Debt of the Company pursuant to Treasury Regulation Section 1.704-2(i)(5);

(c)     increased by the amount, if any, of such Member's share of the Member's Modified 752 Share of Recourse Debt;

(d)     increased by the amount, if any, that such Member is treated as being obligated to contribute subsequently to the capital of the Company as determined under Treasury Regulation Section 1.704-1(b)(2)(ii)(c);

(e)     decreased by the amount, if any, of cash that is reasonably expected to be distributed to such Member, but only to the extent that the amount thereof exceeds any offsetting increase in such Member's Capital Account that is reasonably expected to occur during (or prior to) the tax year during which such distributions are reasonably expected to be made as determined under Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(6); and

(f)     decreased by the amount, if any, of loss and deduction that is reasonably expected to be allocated to such Member pursuant to Code Section 704(e)(2) or 706(d), Treasury Regulation Section 1.751-1(b)(2)(ii) or Treasury Regulation Section 1.704-1(b)(2)(iv)(k).

"**Affiliate**" - (a) with respect to any Person who is a natural person, each entity that such Person Controls or is a beneficiary of the Control of such entity; and (b) with respect to any Person that is an entity, (i) each entity that such Person Controls, (ii) each Person that Controls such Person, and (iii) each entity that is under common Control with such Person.

"**Annual Operating Budget**" – shall mean the projected financial costs and expenses required to operate all functions of the Company for a given Fiscal Year, including, but not limited to, all costs and expenses associated with (a) design and construction, (b) rent, (c) insurance, (d) equipment, (e) licenses and permits, (f) menu (development and costs of sourcing





ingredients), (g) beverages, (h) office/admin, (i) employees and other staffing, (j) marketing, (k) uniforms, (l) accounting, (m) legal, and (n) taxes.

The Annual Operating Budget shall also include projected balance sheets and profit and loss statements for each quarter.

**"Articles"** – shall mean the Articles of Organization of the Company, as filed with the New York Department of State, as amended or restated from time to time.

**"Bankruptcy"** or **"Bankrupt"** - with respect to any Person, or Persons that (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of such Person's or of all or any substantial part of such Person's properties; or (iv) a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced against such Person and 120 days have expired without dismissal or a trustee, receiver, or liquidator has been appointed and 90 days have expired without the appointment having been vacated or stayed.

**"Book Value"** – with respect to any asset, the adjusted basis of the asset for federal income tax purposes, adjusted as provided in 4.06(d).

**"Business Day"** –Monday through Friday from 9am to 5pm local time, and excluding weekends and any day on which the securities markets located in the United States are open for trading.

**"Capital Account"** - the account to be maintained by the Company for each Member in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv) and, to the extent not inconsistent therewith, the following provisions:

      (a)      a Member's Capital Account shall be credited with the cash or Net Agreed Value of the Member's Capital Contributions, the amount of any Company liabilities assumed by the Member, the Member's distributive share of Profit and any item of income or gain allocated to the Member pursuant to the provisions of Article 5; and

      (b)      a Member's Capital Account shall be debited with the amount of cash and the Net Agreed Value of any Company property distributed to the Member pursuant to any provision of this Agreement, the Member's distributive share of Loss and any item of expenses or losses allocated to the Member pursuant to the provisions of Article 5.

If any Membership Interests are transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Membership Interests; provided, however, that if the transfer causes a termination of the Company under Code Section 708(b)(1)(B), the Capital Accounts of the Members shall be adjusted in conformance with Treasury Regulation Section 1.704-1(b)(2)(iv)(1).

**"Capital Contribution"** - with respect to any Member, the amount of money or agreed value of property contributed to the Company by the Member, including in-kind contributions as

2

listed on Exhibit A. Any reference in this Agreement to the Capital Contribution of a Member shall include a Capital Contribution of such Member's predecessors in interest.

**"Capital Transaction"** – any sale, assignment, exchange or other disposition or transfer of the assets of the Company or a related series of transactions, other than in the ordinary course of business.

**"Change of Control"** means, with respect to any Person who is not a natural person, (a) the sale of all or substantially all of such Person's assets in one transaction or series of related transactions, (b) a merger, consolidation, refinancing or recapitalization as a result of which the holders of such Person's Control immediately before such transaction do not hold the Control of the continuing or surviving entity immediately after such transaction and/or (c) the acquisition (in one or more transactions), by any other Person or Persons acting together, of Control, directly or indirectly, of such Person, notwithstanding the forgoing, a transfer of all or substantially all of such Person's assets, stock or membership interests to an Affiliate shall not constitute a Change of Control.

**"Code"** -- the United States Internal Revenue Code of 1986, as amended from time to time.

**"Company"** – Plant-Based Pizza New York LLC, a New York limited liability company, with its principal place of business to be at location to be determined by the members, with a d/b/a of Plant Pizza.

**"Control"** means, with respect to any Person that is an entity, the holding by any other Person (together with its Affiliates) of a majority of the issued and outstanding voting securities, directly or indirectly, of such Person, and the term "Controlled" and "Controlling" should be construed accordingly.

**"Distributable Cash"** means the amount of money on hand of the Company and available for distribution to the Members, taking into account all accrued debts, liabilities, and obligations of the Company and any amounts necessary or advisable to reserve, designate, or set aside for actual or anticipated costs, payments, liabilities, obligations, and claims with respect to the Company's business, all as determined by the Manager.

**"Fiscal Year"** – the twelve (12) month period beginning January 1 and ending December 31 of the same year.

**"Incompetency"** means an adjudication of insanity or incompetency or any total or partial disability which renders a Person unable to perform their ordinary duties for a period of six (6) consecutive months.

**"Law"** - the New York Limited Liability Company Law, and any successor statute, as amended from time to time.

3

"**Manager**" – shall refer to each Person named as a Manager in this Agreement and any person who becomes as additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity as a Manager of the Company.

"**Material Transaction**" shall mean:

(a) the entering into, amendment or termination of any employment contract or arrangement providing for future compensation with any officer, consultant, director, employee, independent contractor or company that leases or loans workers of greater than $25,000.00 in any one year;

(b) Any contracts providing for bonuses, pensions, deferred compensation, retirement payments, profit-sharing, or the like and all severance, change in control or similar arrangements with any officers, employees or agents that will result in any obligation (absolute or contingent) to make any payment to any officers, employees or agents following termination of employment;

(c) Any joint venture, partnership or joint development contract or any other contract which has involved or is expected to involve a sharing of profits;

(d) Any material agreement, license, franchise, permit, indenture or authorization which has not been terminated or performed in its entirety and not renewed;

(e) Any contract containing covenants purporting to limit the Company's freedom to compete in any line of business in any geographic area; or

(f) Any contract providing for the acquisition, directly or indirectly (by merger or otherwise), of all or substantially all of another business or the assets or any part of the capital stock of another Person.

"**Member**" – means (a) each initial Member until such time, if any, that any such Person ceases to be a Member, (b) any Person acquiring Units directly from the Company in accordance with this Agreement until such time, if any, that any such Person ceases to be a Member, and (c) any Person who acquires Units in the Company in a Permitted Transfer and who is deemed, or is admitted as, a Substitute Member (as defined below) until such time, if any, that such Person becomes a Withdrawn Member.

"**Membership Interests**" - with respect to any Member, (a) that Member's status as a Member; (b) that Member's share of the income, gain, loss, deduction and credits of, and the right to receive distributions from, the Company; (c) all other rights, benefits and privileges enjoyed by that Member (under the Act, the Articles, this Agreement or otherwise) in its capacity as a Member, including that Member's right to vote, consent and approve and otherwise to participate in the management of the Company; and (d) all obligations, duties and liabilities imposed on that Member (under the Act, the Articles, this Agreement or otherwise) in its capacity as a Member, including any obligations to make Capital Contributions.

"**Member Non-recourse Deductions**" – the meaning assigned to the term "partner non-recourse deductions" in Treasury Regulation Section 1.704-2(i).

"**Member Non-recourse Debt**" – the meaning assigned to the term "partner non-recourse debt" in Treasury Regulation Section 1.704-2(b)(4).

4

**"Member Non-recourse Minimum Gain"** – the meaning assigned to the term "partner non-recourse minimum gain" in Treasury Regulation section 1.704-2(i)(3).

**"Member's Representative"**- any living Person appointed by a Member that is a corporation, Limited Liability Company or other entity.

**"Modified 752 Share of Recourse Debt"** - of any Member, as of any date, the aggregate amount of economic risk of loss that such Member and all Related Persons to such Member are treated as bearing with respect to such liability pursuant to Treasury Regulation Section 1.752-2 with respect to any Company liability (or portion thereof) that is neither a nonrecourse liability nor a Company liability that is treated as a "member nonrecourse debt" under Treasury Regulation Section 1.704-2(b)(4) (determined, as of the date in question, by assuming, for purposes of Treasury Regulation Section 1.752-2, that the Company constructively liquidates on such date (within the meaning of Treasury Regulation Section 1.752-2) except that all Company properties shall be deemed thereunder to be transferred in fully taxable exchanges for an aggregate amount of cash consideration equal to their respective book values and such consideration shall be deemed thereunder to be used, in the appropriate order of priority, in full or partial satisfaction of all Company liabilities).

**"MSA"** – the meaning assigned to that term in Section 5.8 of this Agreement.

**"Net Agreed Value"** - (a) in the case of any property contributed to the Company, the book value of the Company's property reduced by any indebtedness either assumed by the Company upon the contribution of the property or to which such property is subject when contributed; and (b) in the case of any property distributed to a Member, the book value of such property reduced by any indebtedness either assumed by such Member upon such distribution or to which such property is subject at the time of distribution.

**"Net Cash Flow"** - all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash funds used to pay current Operating Expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Manager.

**"Non-recourse Deductions"** – the meaning assigned to that term in Treasury Regulation Section 1.704-2(b)(1).

**"Non-recourse Liability"** - the meaning assigned that term in Treasury Regulation Section 1.704-2(b)(3).

**"Officer"** – any Person designated as an officer of the Company as provided in section 5.06, but such term does not include any Person who has ceased to be an officer of the Company.

**"Operating Expenses"** - Company expenses, excluding interest, depreciation, amortization and tax expenses.

**"Person"** - the meaning assigned that term in the New York Act.

"**Profit and Loss**" - for each fiscal year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(a)     all items of income, gain, loss and deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(b)     any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(c)     any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(d)     gain or loss resulting from any disposition of Company property shall be computed by reference to the book value of the property;

(e)     in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account depreciation; and

(f)     if the book value of an asset of the Company is adjusted pursuant to Section 5.05, any increase or decrease in the book value of the asset as a result of the adjustment shall be treated as gain or loss, respectively, from the disposition of the asset and shall be taken into account in computing Profits or Losses.

"**Securities Act**" - Securities Act of 1933, as amended.

"**Sharing Ratio**" - as to a Member, the percentage obtained by dividing the Membership Units of such Member by the total Membership Units of all Members at that time.

"**Sale Transaction**" has the meaning set forth in Section 4.7.

"**Subscription Agreement**" – the Membership Unit Subscription Agreement for the purchase and sale of Units.

"**Third Parties**" – means any Person other than a Member or an Affiliate of a Member.

"**Transfer**" means the sale, assignment, transfer, exchange, pledge or other conveyance, disposal or encumbrance of all or a portion of a Membership Interest, or a Change of Control of any Member.

"**Treasury Regulations**" – the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute proposed or final Treasury Regulations.

"**Unanimous Consent**" – means all Members are required to vote in the affirmative or against a pending matter, issue, or Material Transaction.

6

"**Units**" – means the economic interest in the Company acquired by a Member or Unit Holder representing the economic rights of a Member or Unit Holder and the Member's or Unit Holder's permitted assignees and successors to share in distributions of cash and other property from the Company pursuant to the Act and this Agreement, together with the Member's or Unit Holder's distributive share of the Company's Profits and Losses.

"**Unit Holder**" – means a Person who owns Units of the Company but who is not a Member including, except as otherwise provided herein, a Member who has withdrawn.

Other terms defined herein shall have the meanings so given them.

1.02 **Construction**. Unless the context requires otherwise: (a) the gender of all words used in this Agreement includes the masculine, feminine, and neuter; (b) references to Articles and Sections refer to Articles and Sections of this Agreement; and (c) references to Exhibits are to the Exhibits annexed to this Agreement.

1.03 **Confidentiality.** Each Member must keep all of the proprietary, confidential information of the Company confidential and must not divulge to any other party any of such information, unless such information is or becomes generally available to the public other than as a result of a disclosure by such Member, or is required to be disclosed by law or by a judicial, administrative, or regulatory authority. Additionally, each Member must keep the terms of this Agreement strictly confidential.

1.04 **Partial Invalidity.** If any provision of this Agreement or its application to any person or circumstance is to any extent invalid or unenforceable, the remainder of this Agreement, or the application of such term to persons or circumstances other than those as to which it is invalid or unenforceable, will not be affected. Each provision of this Agreement will be valid and enforceable to the fullest extent permitted by law.

1.05 **Governing Law.** This Agreement is governed by, and will be construed in accordance with, the laws of the State of New York.

**ARTICLE 2**
**ORGANIZATION**

2.01 **Formation**. The Company has been organized as a New York limited liability company by the filing of Articles of Organization (the "**Articles**") with the Secretary of State of New York in accordance with the Act, under file number _____.

2.02 **Name**. The name of the Company is "Plant-Based Pizza New York LLC" and all Company business must be conducted in that name or such other names as the Managers may select.

2.03 **Registered Office; Registered Agent; Principal Office in the United States; Other Offices**. The registered office and registered agent of the Company in the State of New York shall be as specified in the Articles of Organization of the Company or as designated by the



7

Managers in the manner provided by law. The principal location of the Company shall be at 65 Second Ave, New York, New York 10003.

2.04 **Purposes**. To (i) develop, own and operate a restaurant company that will create organic, plant-based pizza concept; (ii) to enter into, from time to time, such financial arrangements as may be necessary, appropriate or advisable (including, without limitation, borrowing money and issuing evidence of indebtedness and securing the same by mortgage, deed of trust, security interest or other encumbrance upon one or more or all of the Company assets); (iii) to sell, assign, lease, exchange or otherwise dispose of, or refinance or additionally finance one or more or all of the Company assets; (iv) to raise additional capital by issuance of additional Membership Interests in the Company as provided by Section 3.04; and (v) to engage in any other business or activity that now or hereafter may be necessary, incidental, proper, advisable, or convenient to accomplish the foregoing purposes (including obtaining financing therefor) and that is not forbidden by law.

2.05 **Powers.** The Company shall have all powers of a limited liability company under the Act and the power to do all things necessary or convenient to operate its business and accomplish its purposes as described in Section 2.04.

2.06 **Limitations on Scope of Business.** Except for the authority expressly granted to the Manager in this Agreement, no Member, employee or other agent of the Company shall have any authority to bind or act for the Company or any other Member in the carrying on of their respective businesses or activities.

2.07 **Term**. The Company commenced on the date the Secretary of State of New York issued a certificate of organization for the Company and its period of duration shall be such period as may be permitted by the Act.

2.08 **Company Classification.** The Members intend that the Company always be operated in a manner consistent with its treatment as a "partnership" for federal and state income tax purposes. The Members also intend that the Company not be operated or treated as a "partnership" for purposes of Section 303 of the Federal Bankruptcy Code or for purposes of state law. Neither the Manager(s) nor the Members may take any action inconsistent with the express intent of the parties hereto.

## ARTICLE 3
## MEMBERS AND CAPITAL CONTRIBUTIONS

3.01 **Members**. The initial Members shall be the Members as set forth on the attached Exhibit "A" as the second amendment.

3.02 **Left Blank.**

3.03 **Liability of Members**. No Member shall have any personal liability with respect to the liabilities or obligations of the Company. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or the management of its




business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities or obligations of the Company.

3.04 **Creation of Additional Membership Interests.** Additional Membership interests may be created and issued to existing Members or other investors who may be admitted to the Company as Members, at the direction of and on such terms and conditions as the Members may determine. The Members may reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be approved by a unanimous consent to be effective. Any such admission is effective only after the new Member has executed and delivered to the Company (i) an instrument containing the notice address of the new Member, (ii) the new Member's ratification of this Agreement and agreement to be bound by it, and (iii) the new Member's execution of the Subscription Agreement and (iv) provision by the new Member to the Company of any other document(s) which the Manager may reasonably require.

3.05 **Liability to Third Parties.** No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.06 **Initial Capital Contributions.** Each Member has funded their respective initial Capital Contribution to the Company described in Exhibit A, with additional funds noted as such.

3.07 **Subsequent Contributions.** No Member shall be required to make any additional Capital Contributions to the Company without prior approval by a unanimous consent. However, each Member acknowledges that if necessary, additional capital (or loans) may be raised from Third Parties, to ensure the viability of the Company. Any capital event from Third Parties may dilute all Member's respective ownership interest based on a prorated basis of the additional capital raised only if approved by a unanimous consent of the Members whose ownership interest is being diluted.

3.08 **Return of Contributions.**

(a) <u>No Return of Common Capital Contributions</u>  Except as otherwise provided in this Agreement, or unless as agreed in writing between the Member and the Company, no Member shall demand or receive a return of such Member's Capital Contributions or withdraw from the Company without prior approval by a unanimous consent.

(b) <u>No Interest on Capital Contributions</u>. No Member shall receive any interest with respect to the Member's Capital Contributions or the Member's Capital Account.

An unpaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions. No Member or Manager will be personally liable for the return of any Capital Contributions of any Member.

3.09 **Advances by Members.** If the Company does not have sufficient cash to pay its obligations, during year one, Raymond Azzi and Khalil Saliba (or an entity of their mutual choice), would be required to fund any shortfalls in operating expenses. Starting in year two, all members will be required to fund any shortfall in operating expenses based on a prorated amount



9

of their membership interest. Any operating advances from a Member will receive priority of return from the net profits of the company.

3.10 **Capital Accounts.** A Capital Account shall be established and maintained for each Member.

3.10.1 **Operating Account**. One month prior to the expected opening of the location, Ray Azzi and Khalil Saliba shall each contribute $10,000 top be held in a separate operating account for the expenses associated with the opening of this venture. The return of these operating expense contributions shall receive priority of return from the net profits of the company.

3.11 **Withdrawal, Resignation and Retirement Generally.** No Member may withdraw, resign or retire from the Company without prior approval by a unanimous consent of the remaining Members (including with respect to how such Member's Membership Interest shall be dealt with upon withdrawal, resignation or retirement).

3.12 **Removal Generally.** A Member may be removed from the Company for "Cause", but only after: (1) a unanimous consent of the other Members to remove the Member in question for Cause, and (2) subsequent establishment of Cause either by (x) written acknowledgment by the Member subject to removal (including as agreed in any written agreement, including any membership unit grant agreement, between such removed Member and Company), or (y) a final, unappealable adjudication pursuant to Section 10.01. Following a vote for removal, but prior to subsequent establishment of "Cause", the Member in question shall be considered removed, but shall be reinstated as a Member if "Cause" is not established in a proceeding pursuant to Section 10.01.

3.13 **Definition of Cause.** For purposes of this Agreement, "Cause" shall mean: (a) a Member or MKC (as to management services and specifically defined in the separate Management Services Agreement) materially breaches this Agreement (in its capacity as a Member, Manager, officer of the Company or any capacity whatsoever) and/or the MSA and fails to cure the breach within 30 days after receiving notice of the breach; (b) a Member or MKC (as management company) engages in fraudulent or illegal actions material and relating to the business or internal affairs of the Company; (c) a Member's or MKC's (as management company)' involuntary retirement due to Incompetence, (d) a Member or MKC (as management company) withdrawals, resigns, and/or retires as a Member without consent in violation of this Agreement, or (e) any other act or event constituting "Cause" under this Agreement as agreed in any written agreement, including any membership unit grant agreement, between any Member and Company.

3.14 **Termination of Membership Interest.** Upon (a) the Transfer of a Member's Membership Interest in violation of this Agreement, or (b) a removal event under Section 3.12, the Membership Interest of a Member shall be terminated by the Managers and thereafter to the extent that (former) Member maintains any continuing interest in the Company, and such interest is not purchased pursuant to this Agreement, such Member shall be solely of an Economic Interest Holder. Each Member acknowledges and agrees that the termination or purchase of a



10

Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

3.15 **Variation by Agreement.** Nothing in this Agreement shall limit the ability of the Company to issue Units for ownership subject to continuing obligations set forth in a separate agreement between a Member and the Company. To the extent that any Member ceases to own any Membership Interests, as a result of a sale or transfer of their entire Membership Interest, or redemption or cancellation by the Company of their entire Membership Interest pursuant to the terms of this Agreement, or as specified in any other agreement between such Member and the Company, or for any other reason, such Member shall automatically cease to be a Member as of the date upon which they no longer maintain ownership of any Membership Interest. The Manager is hereby authorized to amend Exhibit A of this Agreement to account for the cessation of membership by any (then former) Member, without approval from the Members.

## ARTICLE 4 TRANSFERS OF INTERESTS

4.1 **Transfers.** In the event that any Member (a "Transferring Holder") wishes to Transfer any Membership Interest of the Company, either directly or indirectly, to any Third Party, it must first comply with all of the provisions of this Article 4; provided, however, that in the event of the death of a Member, a Transfer of such Member's Membership Interest in the Company to such Member's heirs pursuant to the laws of succession, distribution and descent (the "Heirs") will be permitted without further restriction hereunder (including without restriction under Section 4.3.2 with respect to such Member's Membership Interests, but without prejudice to the Special Purchase Right of the Company under Section 4.5); provided further that the restrictions contained in this Article 4 will continue to be applicable to the Membership Interests after any such Transfer and before any such Transfer is effected and that the transferees of such Membership Interests shall agree in writing to be bound by all the provisions of this Agreement and shall execute and deliver to the Company a counterpart of this Agreement. Any purported Transfer of any Membership Interest in contravention of this Article 4 shall be null and void and of no force or effect whatsoever. To the extent that any other agreement between one or more Members includes both transfer restrictions and an integration or merger clause (or term(s) serving that purpose), the transfer restrictions in this Article 4 shall remain validly in existence unless such other agreement expressly and specifically states that it is intended to void the terms herein, and such other agreement is approved, as if an amendment of this Agreement. The terms of this Agreement and any such other agreement shall be read if possible so as not to conflict, however, to the extent of a direct conflict, the terms of this Agreement shall control. Additional restrictions on the Transfer of any Membership Interest shall not be construed as to conflict with this Agreement.

4.2 **The Members Right of First Offer.**

4.2.1. Before a Member shall be entitled to sell, assign, Transfer or otherwise dispose of all or any of its Membership Interest, such Member (the "Intended Seller") must comply with this Section 4.2 and offer to sell their interest to another Member. If such Member intends to sell all or a portion of its Membership Interest, such Member shall deliver to the Company a written notice ("First Notice") to that effect to the Company and to all other Members. Any Member shall have the option, but not the obligation, to make a binding offer to purchase the relevant

portion of the Membership Interest of the Intended Seller (the "First Offer") within thirty (30) days of the receipt of such First Notice (the "First Offer Deadline"), it being specified that such First Offer shall not provide for any representation and warranties (except warranties of title and no encumbrances, liens or judgments) and shall remain valid for 90 days. The Intended Seller shall then have an option to accept or refuse such First Offer.

4.2.2. If the Intended Seller wishes to accept the First Offer, the relevant Members shall purchase the relevant portion of the Membership Interest of the Intended Seller in accordance with the terms and conditions of the First Offer within 60 days of its acceptance by the Intended Seller (the "First Offer Completion Deadline").

4.2.3. If the Intended Seller wishes to refuse the First Offer, it shall be entitled to pursue other offers to sell all or a portion of its Membership Interest, it being specified that in such a case the Intended Seller shall be entitled for a period of six (6) months as from the refusal of the First Offer to Transfer the relevant portion of its Membership Interests to any Third Party provided that (i) the price offered by such Third Party is higher than the price indicated in the First Offer and (ii) such Third Party accepts to be bound by the terms of this Agreement by becoming a party hereto.

4.2.4 If no First Offer is made to the Intended Seller before the First Offer Deadline or if the relevant Members fail to comply with their obligations to purchase the relevant portion of the Membership Interest of the Intended Seller before the First Offer Completion Deadline, the Intended Seller shall be entitled for a period of six (6) months as from the First Offer Deadline or the First Offer Completion Deadline (as the case may be) to Transfer the relevant portion of its Membership Interests to any Third Party without any restrictions relating to the price offered by such Third Party, provided only that such Third Party accepts to be bound by the terms of this Agreement by becoming a party hereto.

4.2.5. For the sake of clarity, the Intended Seller shall not be entitled to sell the relevant portion of its Membership Interests to any Third Party if no Transfer of such Membership Interests has occurred within the six (6) months period provided for in Section 4.2.3 or 4.2.4 above (as applicable), without complying again with the provisions of this Section 4.2.

### 4.3 Restrictions on Transfers.

4.3.1 Membership Interest. Notwithstanding the foregoing, any Transfer or purported Transfer of any Membership Interest, whether to another Member or to a third party, shall be of no effect, and such transferee shall not become a Member, (i) if, in the determination of all of the Members not participating in such proposed transaction, such Transfer, alone or when combined with other transactions, would result in a termination of the Company within the meaning of Section 708 of the Code; (ii) without an opinion of counsel satisfactory to the Managers that such Transfer is subject to an effective registration under, or exempt from the registration requirements of, the applicable state and federal securities laws (which opinion may be waived by the Manager in its discretion); (iii) if such Transfer would cause the Company to register as an "investment company" under the Investment Company Act of 1940.

 

12

4.4    **Transfer Documentation.** Subject to compliance with this Article 4, the Manager shall admit a transferee of a Member's Membership Interest to the Company only if such transferee (A) has agreed in writing to be bound by the terms of this Agreement by becoming a party hereto and (B) has delivered such additional documentation as the Manager shall reasonably require to so admit such transferee to the Company. Notwithstanding anything contained herein to the contrary, both the Company and the Manager shall be entitled to treat the transferor of a Membership Interest as the absolute owner thereof in all respects, and shall incur no liability for distributions of cash or other property made in good faith to it, until such time as a written assignment or other evidence of the consummation of a Transfer that conforms to the requirements of this Article 4 and is satisfactory to the Manager has been received by the Company, and the other requirements of this Article 4 have been satisfied to the satisfaction of the Manager. The effective date of any Transfer permitted under this Agreement shall be the close of business on the day of receipt thereof by the Company.

4.5    **Special Purchase Right.**

4.5.1    Grant. In connection with (i) the dissolution of a Member's marriage or relationship or the legal separation of a Member and such Member's spouse or partner (including, for purposes of this Section 4.1, a Member's live-in companion, hereinafter, a "Member's Spouse") where such Member's Membership Interest or any part thereof has been awarded to the Member's Spouse as part of a final, unappealable judicial determination or final executed written dissolution or separation agreement between the Member and the Member's Spouse, (ii) a Member being dissolved, adjudicated bankrupt or being placed in a receivership, (iii) any other involuntary Transfer by operation of law or otherwise (including with respect to a Transfer made to a Member's Heirs), (iv) the Change of Control of a Member, the Company shall have the right (the "Special Purchase Right"), exercisable at any time during the thirty (30) calendar day period following the Company's receipt of the required Special Notice under Section 4.5.2, to purchase, in accordance with the provisions of this Article 4, all or any portion of the Units which would otherwise be awarded to such transferee.

4.5.2    Notice. Each Member (or the representative of such Member's estate in the event of such Member's bankruptcy or dissolution, or the Member's Heirs if applicable) shall promptly provide to the Manager written notice (the "Special Notice") of (i) the entry of any judicial decree or order resolving the property rights of such Member and such Member's Spouse in connection with his or her marital or other dissolution or legal separation, (ii) the execution of any contract or agreement relating to the distribution or division of such property rights, (iii) the finding by a court of competent jurisdiction that the Member is bankrupt, or the placement of the Member in a state of receivership, (iv) the date of dissolution or any other involuntary transfer, or (v) the date of a Change of Control of any Member that is an entity. The Special Notice shall be accompanied by a copy of the actual decree of dissolution, settlement agreement, order of bankruptcy or receivership or such other document providing for the transfer of title to the Units from the applicable Member to any other Person, and shall specify with particularity the number of each class of Units subject thereto.

4.5.3    Exercise of Special Purchase Right. The Special Purchase Right shall be exercisable by delivery of written notice (the "Purchase Notice") to the applicable Member and

13

such Member's Spouse (in the event of marital dissolution or legal separation), representative of such Member's estate (in the event of such Member's bankruptcy), to the Heirs (in the event of death of the Member) or representative of the new Controlling Person (such Persons hereinafter referred to as "Transferee") within thirty (30) calendar days after the Company's receipt of the Special Notice. The Purchase Notice shall indicate the amount of each class of Units to be purchased by the Company, the date such purchase is to be effected (the "Purchase Date") (such date to be not less than five (5) Business Days, nor more than ten (10) Business Days, after the date of the Purchase Notice), and the fair market value to be paid for such Units, as determined in good faith by the Managers (the "Fair Market Value"). The Company shall, on the Purchase Date, pay to the Transferee an amount in cash equal to the Fair Market Value specified in the Purchase Notice. If the Transferee does not agree with the Fair Market Value specified for the relevant Membership Units in the Purchase Notice, the Transferee shall promptly notify the Company in writing of such disagreement and the fair market value of such Units shall thereupon be determined by an appraiser of recognized standing selected by the Manager and the Transferee. If the Manager and the Transferee cannot agree on an appraiser within twenty (20) calendar days after the date of the Purchase Notice, each shall select an appraiser of recognized standing and the two (2) appraisers shall designate a third appraiser of recognized standing whose appraisal shall be determinative of such value. The cost of the appraisal shall be shared equally by the Company and the Transferee. The closing shall then be held on the fifth Business Day following the completion of such appraisal; provided, that if the appraised value is more than fifteen percent (15%) greater than the Fair Market Value specified for the relevant Membership Units in the Purchase Notice, the Company shall have the right, exercisable prior to the expiration of such five (5) Business Day period, to rescind the exercise of the Special Purchase Right and thereby revoke its election to purchase the Units.

       4.5.4   Lapse. The Special Purchase Right under this Section 4.5 shall lapse and cease to have effect upon the expiration of the thirty (30) day exercise period specified in Section 4.5.3, to the extent the Special Purchase Right is not timely exercised in accordance with such Section 4.5.3.

      4.6      **Transfer of Membership Interests Upon Removal of a Member.**

       4.6.1   Purchase Price. In the event of a removal of a Member pursuant to Section 3.12, the removed Member's Economic Membership Interest (the "Removed Interest") may be purchased by one or several of the remaining Members or a third party proposed by the remaining Members pursuant to a unanimous consent once the "Cause" is established in a proceeding pursuant to Section 10.01 for a purchase price equal to 50% of the Fair Market Value of the Removed Member's Membership Interest as established (as of the Removal date, i.e., the date of the Member's initial decision on "Cause") pursuant to 4.5.3 and paid together with interest at the lowest legal rate (per the internal revenue service) pursuant to a secured promissory note in four equal installments at the end of each year following the Removal date. In the event of a material default on such payments, the holder of the note shall have the option of accelerating payment or requiring the Company to issue a number of Units to the holder in accordance with a percentage of the Units purchased equal to the ratio of the amount of payments not yet made to the aggregate amount to be paid pursuant to the note. (e.g. a Member who held ten (10) Units and who holds a note that Company has paid off fifty percent (50%) of



14



the price determined in accordance with the provisions of this Section 4.6.1 could cause the purchaser(s) of those Units to retransfer him 5 Units for no consideration).

4.6.2 Notice of Intent to Purchase. Within ten (10) days after the final determination of the price to be paid for the Removed Interest, the Company shall notify each remaining Member of such price.

4.6.3 Closing of Purchase of Removed Interest. The closing ("Closing") for the sale of a Removed Interest pursuant to this Section shall be held at the principal office of Company no later than 10:00 a.m., thirty (30) days after the determination of the price to be paid for the Removed Interest, except that if the Closing date falls on a Saturday, Sunday, or New York legal holiday, then the Closing shall be held on the next succeeding business day. At the Closing, the removed Member shall deliver to the Company and/or the remaining Members an instrument of Transfer (containing warranties of title and no encumbrances) conveying the Removed Interest. The removed Member or such removed Member's legal representative shall do all things and execute and deliver all papers as may be necessary to consummate fully such sale and purchase in accordance with the terms and provisions of this Agreement. Notwithstanding any other provision in this agreement failure by a removed Member to take any action shall not preclude transfer of any Units in question to (and full ownership of such Units by) the Company (which shall take place automatically at the Closing). Complete satisfaction of such removed Member's obligations under this Agreement shall be a precondition to the Company's payment of any funds to such removed Member pursuant to Section 4.6.4.

4.6.4 Purchase Terms Varied by Agreement. Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

4.7 **Drag Along Rights.** In the event of a proposed Sale Transaction and subject to approval by a unanimous consent, the Transferring Holder(s) may require that each other Member Transfer some or all of his or her Units in the Sale Transaction. Each Member will receive in the Sale Transaction in respect of his or her Units his or her pro rata portion of the entire consideration to be received by all the Members in or following the Sale Transaction based on the number of Units being transferred by such Member. The Transferring Holder(s) shall notify the other Members at least ten (10) days in advance of entering into a definitive agreement in connection with a proposed Sale Transaction. In any such agreement, the other Members will be required to make the same representations, warranties, covenants, indemnities and agreements the Transferring Holder(s) agrees to make in connection with the proposed Sale Transaction as applicable to such Members and to bear a pro rata portion of the costs incurred by the Transferring Holder(s), and it shall be a material breach of this Agreement not to do so in a reasonably timely manner (as dictated by the requirements of the Sale Transaction).

For purposes of this Section the following terms have the following meanings: "Sale Transaction" means the Transfer by Transferring Holders holding over 51% of the then outstanding Units in one transaction or a series of transactions (other than pursuant to a public offering under the Securities Act or pursuant to Rule 144), of all or any portion of his or their Units, respectively to a Third Party or group of Third Parties and, as a result of which, such

15

Third Party or group of Third Parties would own a majority of the outstanding Units upon consummation of the Sale Transaction.

**4.8     Units Not Certificated.**  The Units of the Company shall not be certificated. Ownership of the Units shall be conclusively evidenced by the Company's books and records.

## ARTICLE 5  MANAGEMENT OF THE COMPANY

**5.1     Management by Manager of the Company and MKC Management Services**

5.1.1   Authority to Manage and Powers and Duties, Generally.

(a)     Other than as set forth in this Agreement and/or in the Act, the management and control of the business and affairs of the Company shall rest exclusively with the Manager, and who initially shall be as set forth in Section 5.3.

(b)     The Manager shall have the general powers and duties of management typically vested in the officers and such other powers and duties as may be prescribed by this Agreement and the Act, and the specific duties and responsibilities agreed upon in writing by a unanimous consent.

5.1.2   Resignation.  A Manager or a member may resign at any time by giving at least 30 days' notice to the Members and the Company.  Subject to Section 5.1.5, the resignation shall take effect upon the expiration of such 30-day notice period or such later time as shall be specified in such notice and the acceptance of such resignation shall not be necessary to make it effective.  If the Manager is also a Member, its resignation shall not, by itself, affect its rights as a Member and shall not constitute its withdrawal as a Member.

5.1.3   Removal.  A Manager may only be removed at any time, with or without cause, by a unanimous consent.  Any removal pursuant to this Section 5.1.3 shall be made by giving written notice to the Company and the Manager.  If the removed Manager is also a Member, its removal shall not, by itself, affect its rights as a Member and shall not constitute its withdrawal as a Member.

5.1.4   Vacancies.  A vacancy occurring for any reason in the position of a Manager shall be filled by the designation of a new Manager by a unanimous consent.

5.1.5   Authority of Manager.  The Manager is vested with the authority to manage the Company's business as set forth in Section 5.1(a), and except as otherwise provided in this Agreement, the Members have no right to participate therein.  Subject to the limitations imposed by this Agreement, the Managers are agents of the Company and have authority to bind the Company in the ordinary course of its business.  For example, other than as set forth in this Agreement, the Manager may: (a) expend the Company's funds in the conduct of its business; (b) sign and deliver, without additional signatures being required, agreements and documents that are necessary or desirable in the ordinary course of the Company's business, not including documents conveying, leasing, or granting a security interest in any of the Company's assets; and

(c) engage such persons as may be advisable to operate the Company's business. Notwithstanding the foregoing, any decision obligating the Company to incur debt or otherwise making an expenditure not designated in the approved Annual Operating Budget, in the aggregate, greater than $25,000.00 shall require a prior approval by a unanimous consent.

5.1.5.1     Major Decisions. All Major Decisions, as defined below, shall require a prior approval by a unanimous consent of the Members.

(a)     selling, leasing or otherwise disposing of, or granting a mortgage or deed of trust on, all or any of the Company's property, including the granting of options and rights of first refusal or incurring indebtedness for borrowed money and refinancing existing indebtedness, whether secured or unsecured, for borrowed money, except in the ordinary course of business;

(b)     lending money to, or guaranteeing the debts or other obligations of a Member or any other Person;

(c)     making tax elections and other decisions affecting the tax treatment of a Member;

(d)     intentionally left blank;

(e)     obligating the Company to, incurring debt, or otherwise making an expenditure not designated in the approved Annual Operating Budget, in the aggregate, greater than $25,000.00;

(f)     entering into or signing a commercial lease with a tenant in the property to be leased by the Company to conduct its business or making a material modification of the terms of a lease;

(g)     entering into, or amending, a contract between the Company and a Member or an Affiliate of a Member;

(h)     acquiring any real property, whether improved or unimproved, or any interest therein;

(i)     changing the Percentage Interest of any Member only after such Member consents to such change in writing, unless such Member is removed for Cause pursuant to Article 3;

(j)     intentionally left blank;

(k)     any Capital Transaction;

(l)     any Material Transaction.

(m)     admitting an additional Person as a Member;

 

17



(n)     changing the name of the Company;

(o)     dissolving, liquidating and winding-up the affairs of the Company;

(p)     merging or consolidating the Company with or into any partnership, limited liability company, corporation or other entity or restructuring or reformation of the Company;

(q)     filing for bankruptcy, appointment of a receiver or trustee or making a transfer for the benefit of creditors;

(r)     commencing, settling or dismissing litigation by or against the Company that is not covered by insurance or confessing a judgment against the Company or its assets or any portion thereof;

(s)     causing the Company to engage in any business other than developing, owning and operating a holding company that will create organic, plant-based fast casual takeout and juice bar concepts;

(t)     establishing reserves in excess of $25,000.00;

(u)     issuing additional Units or any additional rights to acquire any equity interests or other securities of the Company or securities which are convertible into or exchangeable for equity interests or other securities of the Company; and

(v)     any (1) purchase, redemption or other acquisition or retirement for value by the Company of equity interests in the Company; (2) issuance or sale of any senior class of equity in the Company; or (3) change to the amount or rights of the outstanding equity interests in the Company; or

(w)     amending any material term of the Operating Agreement or the Articles of the Company.

(x)     Adding items to the menu that involve non-plant-based ingredients such as animal products (i.e. meat, fish, or dairy).

5.1.6   Restrictions on Authority of Managers.

(a)     The Manager may never do any of the following:

(a.i)   knowingly do any act in contravention of this Agreement;

(a.ii)  knowingly do any act which would make it impossible to carry on the ordinary business of the Company; and

(a.iii) knowingly perform any act that would subject any Member to personal liability in any jurisdiction.

18

(b)     Additionally, the Managers must first obtain the prior approval by a unanimous consent to convert the Company into another form of business entity (other than in connection with a Sale Transaction (as defined in Section 4.7) or an initial public offering.

5.2     **Transactions with Affiliates/ Acknowledgement and Waiver of Conflicts of Interest.** Nothing in this Agreement shall preclude any transactions between the Company and any Member or an Affiliate of any Member acting for its own account, provided that any services performed or products provided by the Members or any such Affiliate are services and/or products that the Manager(s) reasonably believe, at the time of requesting such services, to be in the best interests of the Company, and that any such transactions are pursuant to such terms as might be negotiated at "arm's length" by two unrelated parties in similar circumstances. Notwithstanding the previous sentence, neither any agreement heretofore entered into by the Company, with any Affiliate or otherwise, nor the continued performance of any such agreement will form the basis of any claim or action in contract, tort or otherwise.

5.3     **Designation of Manager.** The Manager shall be Khalil Saliba, until removed pursuant to Section 5.1.3.

5.4     **Deadlock Resolution.** In the event that with respect to any decision that is reasonably expected to have a direct material effect on the Company's financial health or prospects, the Managers are deadlocked, or have otherwise reached an impasse, the Managers shall as quickly as reasonably practical arrange to present such matter to the Members for resolution. In the event that the Members are deadlocked or have otherwise reached an impasse with respect to the same decision, or in the event the Members are deadlocked or have otherwise reached an impasse on any issue to be decided or approved by the Members, the Members shall as quickly as reasonably practical arrange to present such matter to a single arbitrator, who shall be a retired judge, chosen pursuant to, and employing, the procedures specified in Section 10.01. Each Member shall make such presentation of evidence and argument to the arbitrator as they see fit, subject to a limit on the time of such presentation to two (2) hours. Such arbitrator shall resolve the deadlock by deciding the matter so as to provide for the best interest of the Members, and such decision shall be binding and non-appealable. If the Members cannot agree on a single arbitrator, the Members shall request that JAMS randomly assign the matter to an arbitrator in the county set forth in Section 10.01, or located in another county mutually agreeable to the Members, who has a knowledge of the business matters relevant to the dispute in question, which arbitrator shall thereupon preside over the deadlock procedure.

5.5     **Officers.**

5.5.1     The Manager may designate one or more Persons to be Officers of the Company. No Officer need be a resident of the State of New York, a Member or a Manager. Any Officers so designated shall have such authority and perform such duties as the Manager may delegate to them. The Manager may assign titles to particular Officers. Unless the Manager decides otherwise, if the title is one commonly used for Officers of a business corporation formed under the New York Corporations Code, the assignment of such title shall constitute the delegation to such Officer of the authority and duties that are normally associated with that office, subject to (i) any specific delegation of authority and duties made to such Officer by the

Manager pursuant to the third sentence of this Section 5.5.1, or (ii) any delegation of authority and duties made to the Manager pursuant to Section 5.5.1. Each Officer shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death, resignation or removal in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the Officers and agents of the Company shall be fixed by the Manager, subject to prior approval by a unanimous consent pursuant to the provisions of Section 5.1.5.1.

5.5.1   Any Officer may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Manager. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any Officer may be removed as such, either with or without cause, by the Manager whenever in the Manager's judgment the best interests of the Company will be served thereby, subject to prior approval by a unanimous consent pursuant to the provisions of Section 5.1.5.1; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the Person so removed. Designation of an Officer shall not of itself create contract rights. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Manager.

5.6   **Limitations on Liability of Manager.** The liability of the Manager to the Company shall be limited to the extent set forth in the Articles.

5.7   **Noncompetition; Restrictive Covenants**.

(a) Unless agreed upon by the proposing Member and a unanimous consent, Members and Member's Representatives may not, directly or indirectly, either individually or through any Affiliates or any other entity, own, operate, lease, manage, invest in, finance, provide financial assistance, or provide any service of any kind, to any other Person or entity for the ownership or operation of a business similar to the Company, defined as a plant-based pizza concept with a substantially similar menu and/or design as the Company, with 3 miles of this Company.

To the extent a Member sells his entire interest in the Company, this clause will expire one (1) year after such Member sells, transfers, surrenders or assigns its interest, unless otherwise agreed to in writing.

A unanimous consent of the Members (other than the concerned Member), in their sole discretion, may waive the restrictions contained in this section if a Member submits a written request for a waiver with full disclosure of all pertinent and relevant information. This section does not restrict any Member or Member's Representative from owning an interest in a publicly held company, if the Member or Member's Representative owns less than 1% of the outstanding securities of such company and does not actively participate in the business of such company.

After a Member sells, transfers, surrenders or assigns its interest, they are prohibited from disparaging or discouraging employees, vendors and third party purveyors of the Company from continuing to provide goods or services to the Company. More generally, if a Member sells, transfers, surrenders or assigns its interest, the outgoing Member is prohibited from doing anything that would disparage or damage the goodwill of the Company.



20

(b)     Except as restricted in this section, the Manager, each Member, and each Member's Representative may engage in any other type of business or activity, provided that they devote sufficient time and effort to the completion of their respective duties for the Company, if any.  The Manager and Members will not be liable or accountable to the Company or the other Members for failure to disclose or make available to the Company any business opportunity that the Member becomes aware of or pursues, except as restricted in this section. The Manager and Members will not be liable to the Company or any other Member for damages or otherwise for pursuing any business or opportunity, except any business or opportunity that is specifically restricted in this section.

(c)     The remedy at law for any breach of this section is and will be inadequate. If a Member or Member's Representative breaches or threatens to breach this section, the Company will be entitled to an injunction restraining the Member and Member's Representative, as applicable, from any breach or threatened breach.  The Company may also pursue any other remedies available for breach or threatened breach, including the recovery of damages.

(d)     The provisions of this section consist of a series of separate covenants. Each Member agrees that the character, duration, and geographical scope of such provisions are reasonable.  If a court or other tribunal determines that the character, duration, or geographical scope of such provisions is unreasonable, then it is the intention and the agreement of the parties that such provisions will be construed (and reformed) in such a manner as to impose only those restrictions on the conduct of the Manager, a Member and a Member's Representative that are reasonable in light of the circumstances as they then exist and as are necessary to assure the Company of the intended benefit of this Agreement.  If, in any legal proceeding, a court or other tribunal refuses to enforce all of the separate covenants included in this section because they are more extensive than necessary to assure the Company of the intended benefit of this Agreement, then those covenants which, if eliminated, would permit the remaining separate covenants to be enforced in such proceeding shall, for the purpose of such proceeding, be deemed eliminated from this Agreement.  The court or tribunal will be authorized to reform the provisions of this section to the extent necessary to eliminate or modify any provisions to the extent it determines them to be unreasonable or unenforceable.

5.8     **Matthew Kenney and MKC Management Services.** MK Cuisine Global LLC, by and through MKC Management Group LLC ("MKC") and overseen by Matthew Kenney in a strategy role, shall be entitled to a monthly management fee of 2.5% of Net Revenue in year one (1) of year operation.

Starting in year two (2), if MK Cuisine Global LLC has assigned at least $30,000.00 out of its share of Net Profits to Raymond Azzi, by the end of year one, then MKC Management Group LLC shall receive 5% of Net Revenue (defined as gross sales minus applicable taxes and complimentary items (comps given to guests)) for managing the Company.

A Management Services Agreement ("MSA") shall be drafted and agreed upon within 30 days of executing this Agreement, and made Exhibit "B".  The MSA shall describe the services included in the use of MKC Management Group, referencing use of MKC's General Counsel (where a conflict does not exist), CFO, Hospitality Director, Culinary Director, Creative Director, Marketing Director, and Matthew Kenney, personally.





21

5.8.1 **Removal for Cause.** The Members may remove MKC as the management company if there is a 66.67% Vote of the Members that Causes exists as per Section 3.13 plus subsequent confirmation of finding of Cause by mutual written agreement between MKC and the Company or using the mechanism described in Section 10.01 or,

If, in year one, $30,000.00 is not assigned by MK Cuisine Global LLC to Raymond Azzi through MK Cuisine Global LLC's share of Net Profits, and at the end of year two, the remaining $70,000.00 is not assigned by MK Cuisine Global LLC to Raymond Azzi through MK Cuisine Global LLC's share of Net Profits, MK Cuisine Global LLC has the option of paying the total remaining balance owed by MK Cuisine Global LLC by the end of year two to Raymond Azzi, or MK Cuisine Global LLC has the option of assigning all of its units to Raymond Azzi for $1.00 and MKC Management Group LLC shall be removed as the provider of management services at the option of Raymond Azzi and Khalil Saliba. All intentions to be made in writing within 30 days following the end of year two.

## ARTICLE 6
## ALLOCATIONS AND DISTRIBUTIONS

6.01 **Distributions of Net Cash Flow of Distributable Cash.** Subject to Section 5.8 and 6.04 below, the Company may periodically distribute Distributable Cash to the Members, with the amount and timing of such distributions to be determined by the Manager subject to a unanimous consent, based on the following:

a.      Any construction and start-up related expenses (estimated to be $100,000.00) to be paid back to the Members from the first $100,000.00 in net profits as per Exhibit "A", finalized no later than 60 days after opening of the concept, and

b.      The first $100,000.00 of MK Cuisine Global LLC's distribution of Net Profits shall to be assigned and distributed to Member Raymond Azzi or an entity of his choice.

Notwithstanding the above, within sixty (60) days after the end of each Fiscal Quarter, the Manager may, subject to a unanimous consent, distribute to the Members an amount equal to thirty percent (30%) of the Company's net taxable income for the Fiscal Quarter just ended (which amount is intended to cover the imposition of applicable federal and state income taxes imposed upon the Members by virtue of their Percentage Interests in the Company (each such distribution, a "Tax Distribution")). Tax Distributions shall be allocated to the Members in proportion to their respective Membership Units measured as of the last day of the applicable Fiscal Quarter.

Distributions of Net Cash Flow with respect to a Fiscal Year shall be made at such times as the Manager determines, subject to a unanimous consent. In no event shall such distributions be made later than the first business day following the lapse of sixty (60) days after the end of the fiscal year to which it relates subject to extension of this sixty (60) days period by a unanimous consent. The date for any distribution of Net Cash Flow shall be determined by the Manager but shall generally be the last day of a fiscal quarter, if quarterly distributions are to be made. No payment of fees, salary, or loans or of other amounts paid in connection with arm's-

22

length transactions to a Member shall be considered a distribution. Distributions of cash or property in respect of a Membership Interest shall be made only to the Member who, according to the books and records of the Company, is the holder of such Membership Interest in respect of which such distribution is made on the date of such distribution.

6.02 **Intentionally Deleted**.

6.03 **Distributions on Dissolution and Winding Up.** Upon the dissolution and winding up of the Company, after adjusting the Capital Accounts for all distributions made under Section 6.01 and other allocations under this Article 6, all available proceeds distributable to the Members as determined under Article 11 shall be distributed to all Members in an amount equal to their respective positive Capital Account balances, or in proportion to their respective positive balances if there are insufficient proceeds to distribute the positive capital balances in full, then based on their pro rata share of Membership Interest described in Exhibit "A".

6.04 **Allocations of Profit and Loss.** Profit and Loss of the Company shall be allocated as follows:

    (a)    Loss shall be allocated in the following order of priority:

        (i)    to each Member until the cumulative Losses allocated to such Member under this Section 6.04(a)(i) equal the cumulative Profits allocated to such Member under Section 6.04(b) for all prior periods; and then

        (ii)    to the Members in proportion to their respective positive Adjusted Capital Account balances in an amount equal to, but not in excess of, the positive Adjusted Capital Account balance of each Member as determined prior to the allocation provided for in this Section 6.04(a)(ii); and then

        (iii)    to the Members in accordance with their Sharing Ratios.

    (b)    Profit shall be allocated in the following order of priority:

        (i)    to the Members in accordance with their Sharing Ratios.

6.05 **Allocation of Net Gains or Net Losses from the Dissolution and Winding Up of the Company.**

    (a)    Net Gains. After adjusting the Capital Accounts for distributions under Section 6.01 and allocations under Section 6.04 for the year, net gain resulting from a sale of the Company's property upon the dissolution and winding up of the Company shall be allocated to the Members in the following order of priority:

        (i)    if the Capital Account of any Member has a negative balance, to such Member to the extent of such negative balance. If the Capital Accounts of more than one Member have a negative balance, net gain, to the extent of the aggregate negative balances in the Capital Accounts of the Members, shall be allocated to the Members in proportion to their respective negative balances; and then

        (ii)    all remaining net gain shall be allocated to the Members in such a manner that, to the greatest extent possible, the Capital Accounts are in proportion to Sharing Ratio.

    (b)    Net Loss. After adjusting the Capital Accounts for distributions under Section 6.01 and allocations under Section 6.04 for the year, net loss resulting from a sale of the Company's property upon the dissolution and winding up of the Company shall be allocated to the Members in the following order of priority:

(i)  to the Members with positive Capital Account balances in proportion to such positive Capital Account balances until such balances are reduced to zero; and then

(ii)  to the Members pro rata.

6.06  **Adjustment of Book Value.** Book Value with respect to the Company or any asset of the Company is the adjusted tax basis for federal income tax purposes, except as follows:

(a)  The initial Book Value of any asset contributed to the Company by a Member shall be the fair market value of the asset as of the date of such contribution.

(b)  The Book Value of each asset shall be its respective fair market value, as of (i) the issuance of a Membership Interest to a new or existing Member in exchange for a Capital Contribution, (ii) the distribution by the Company to a Member in liquidation of the Member's Membership Interest, or (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g).

(c)  The Book Value of each asset distributed to any Member will be the fair market value of the asset as of the date of distribution.

(d)  The Book Value of each asset will be increased or decreased to reflect any adjustment to the adjusted basis of the asset under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining Capital Accounts under Treasury Regulation Section 1.704-1(b)(2)(iv)(m), provided that the Book Value will not be adjusted under this Section 6.06(d) to the extent that an adjustment under Section 6.06(b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment under this Section 6.06(d).

Book Value will be adjusted by depreciation, and gain or loss on a disposition of any asset shall be determined by reference to such asset's Book Value as adjusted herein. The determination of the fair market value of property as required under this Section 6.06 shall be determined by the Manager using any reasonable method of valuation.

Any such determination of Book Value and of the fair market value made by the Manager shall be shared with all investors, including the Manager's method of determination. Members holding at least 20% of the Membership Units shall be given the right to object to the Manager's determination of Book Value and/or fair market value, which objection will require the Manager to produce a follow-up Book Value/fair market value calculation. Should Members owning at least 20% of the Units object to the follow-up calculation, such calculation shall be made by an independent, third party, certified appraisal expert selected by the Manager subject to a unanimous consent of the Members. The determination of such third party appraisal expert will be final and unappealable.

6.07  **Tax Allocations.**

(a)  Except as otherwise provided in this Section 6.07, each item of income, gain, loss, deduction and credit determined for federal income tax purposes shall be allocated among the Members in the same manner as each correlative item of income, gain, loss, deduction and credit is allocated to the Members for purposes of maintaining their respective Capital Accounts.

(b)  Under Code Section 704(c) and Treasury Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss and deduction with respect to any asset contributed to the

24

capital of the Company, solely for federal income tax purposes, shall be allocated among the Members so as to take into account any variation between the adjusted tax basis of the asset for federal income tax purposes and the initial Book Value. If the Book Value of any asset is adjusted under Section 4.06, subsequent allocations of income, gain, loss and deduction, solely for federal income tax purposes, will be allocated among the Members so as to take into account any variation between the adjusted tax basis of the asset and its Book Value as adjusted in the manner required under Treasury Regulation Section 1.704-3(a)(6). The allocations required by this Section 4.07 shall be made by the Manager using any reasonable method that is permissible under applicable law.

      6.08   **Stop Loss.** Notwithstanding any other provision hereof to the contrary, no Loss (or item of loss or deduction) of the Company shall be allocated to a Member if such allocation would result in a deficit balance in such Member's Adjusted Capital Account. Such Loss (or item of loss or deduction) shall be allocated among the Members whose Adjusted Capital Account balances are positive in proportion to such positive balances to the extent necessary to reduce the balances of such other Member's positive Adjusted Capital Accounts balances to zero, it being the intention of the Members that no Member's positive Adjusted Capital Account balance shall fall below zero while any other Member's positive Adjusted Capital Account balance has a positive balance.

      6.09   **Qualified Income Offset.** A Member who unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of income or gain in an amount and in the manner sufficient to eliminate any deficit balance in such Member's Adjusted Capital Account as quickly as possible. This Section is intended to satisfy Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

      6.10   **Curative Allocation.** If any items of income and gain (including gross income) or loss and deduction are allocated to a Member pursuant to this Article, prior to any allocation, items of income and gain (including gross income) and items of loss and deduction for subsequent periods shall be allocated to the Members in a manner designed to result in each Member's Adjusted Capital Account having a balance equal to the balance it would have had as if such allocation of income and gain (including gross income) and item of loss and deduction not occurred.

      6.11   **Gross Income Allocation.** Each Member who has a deficit Adjusted Capital Account balance at the end of the taxable year will be specially allocated items of income and gain in the amount of the excess as quickly as possible.

      6.12   **Interest in Company.** No allocation of Profits or Losses or item thereof will be made to a Member if the allocation would not have "economic effect" under Treasury Regulation Section 1.704-1(b)(2)(ii) or otherwise would not be in accordance with the Membership Interest within the meaning of Treasury Regulation Section 1.704-1(b)(4) or 1.704-2(b)(1). The Manager will have the authority to reallocate any item in accordance with this Section; provided, however, that (a) no such change shall have a material adverse effect upon the amount of cash or other property distributable to any Member, (b) each Member shall have 30 days prior notice of such proposed modification and (c) if such proposed modification would be material, the Company





25

shall have received an opinion of tax counsel to the Company that such modification is necessary to comply with Code Section 704(b).

6.13 **Code Section 754 Adjustment.** To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required to be taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m).

6.14 **Withholding.** All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Members for all purposes under this Agreement.

6.15 **Varying Interests.** All Profit and Loss (and any item of income, gain, loss, deduction or credit specially allocated under this Agreement) shall be allocated, and all distributions shall be made, to the Persons shown on the records of the Company to have been Members as of the last calendar day of the period for which the allocation or distribution is to be made. Notwithstanding the foregoing, if during any taxable year a change occurs in any Membership Interest, the Members agree that their allocable shares of the Profits and Losses (or items thereof) for the taxable year shall be determined on any method determined by the Manager to be permissible by Code Section 706 and the related Treasury Regulations to take account of the varying Membership Interest.

### ARTICLE 7
### INDEMNIFICATION

7.01 **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article 7, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action or proceeding of any type including civil, criminal or administrative (each, a "**Proceeding**") by reason of the fact that he or she, is or was a Manager of the Company or while a Manager of the Company is or was serving at the request of the Company as a member, manager, director, officer, partner, Member, proprietor, trustee, employee, agent, or similar functionary of another entity, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the Act, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than permitted prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article 7 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder, except for conduct for liabilities caused by such Person's gross negligence, recklessness or intentional misconduct. The rights granted pursuant to this Article 7 shall be deemed contract rights, and no amendment, modification or

  26 

repeal of this Article 7 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.

7.02 **Advance Payment.** The right to indemnification shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 7.01 in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification, except no advance payments shall be made for claims brought by those Member's holding at least 66.67% of the Membership Interests; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such Person of its good faith belief that it has met the standard of conduct necessary for indemnification under this Article 7 and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 7 or otherwise.

7.03 **Indemnification of Officers, Employees and Agents.** The Company, if authorized by the Members, may indemnify and advance expenses to an Officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Manager under this Article 7; and, the Company may indemnify and advance expenses to Persons who are not or were not Manager, Officers, employees or agents of the Company but who are or were serving at the request of the Company as a member, manager, director, officer, partner, Member, proprietor, trustee, employee, agent or similar functionary of another entity, employee benefit plan or other enterprise against any liability asserted against such Person and incurred by such Person in such a capacity or arising out of its status as such a Person to the same extent that the Company may indemnify and advance expenses to Manager under this Article 7.

7.04 **Appearance as a Witness.** Notwithstanding any other provision of this Article 7, the Company may pay or reimburse expenses incurred by a Manager in connection with his or her appearance as a witness or other participation in a Proceeding at a time when he or she is not a named defendant or respondent in the Proceeding.

7.05 **Non-exclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article 7 shall not be exclusive of any other right to which a Manager or other Person indemnified pursuant to Section 7.03 may have or hereafter acquire under any law, provision of the Articles or this Agreement.

7.06 **Insurance.** The Company may purchase key man insurance for Matthew Kenney.

7.07 **Savings Clause.** If this Article 7 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, the Company shall nevertheless indemnify and hold harmless the Manager or any other Person indemnified pursuant to this Article 7 as to costs, charges and expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article 7 that shall not have been invalidated and to the fullest extent permitted by law.

  27 

# ARTICLE 8
# TAXES

8.01    **Tax Returns.** The Company shall prepare and timely file all federal, state and local tax returns required to be filed by the Company. The Members shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed. The Company shall deliver a copy of each such return to the Members on or before ten days prior to the due date of any such return, together with such additional information as may be required by the Members in order for the Members to file their individual return reflecting the Company's operations. The Company shall bear the costs of the preparation and filing of its returns.

8.02    **Tax Elections.** The Company shall make the following elections on the appropriate tax returns:

   (a)    to adopt the calendar year as the Company's fiscal year;

   (b)    to adopt the accrual method of accounting and to keep the Company's books and records on the income-tax method;

   (c)    if a distribution of the Company's property as described in Code Section 734 occurs, to adjust the basis of Company's properties; and

   (d)    any other election the Manager may deem appropriate and in the best interests of the Members.

Neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law and no provision of this Agreement shall be construed to approve such an election.

8.03    **Tax Matters Member.**

   (a)    The Manager shall be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code (the "**Tax Matters Member**"). The Tax Matters Member shall take such action as may be necessary to cause to the extent possible each other Member to become a "notice partner" within the meaning of Section 6223 of the Code. The Tax Matters Member shall inform each other Member of all significant matters that may come to its attention in its capacity as Tax Matters Member by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any cost or expense incurred by the Tax Matters Member in connection with its duties shall be paid by the Company.

   (b)    The Tax Matters Member shall take no action without the authorization of the Member or Members other than such action as may be required by law.

   (c)    The Tax Matters Member shall not bind any Member to a settlement agreement without obtaining the consent of such Member. Any Member that enters into a settlement agreement with respect to any Company item (within the meaning of Code Section 6231(a)(3)) shall notify the Company and all other Members of such settlement agreement and its terms within 90 days from the date of the settlement.

28

(d)     No Member shall file a request pursuant to Code Section 6227 for an administrative adjustment of Company items for any taxable year without first notifying the Company and all other Members. If the Member or Members consent to the requested adjustment, the Tax Matters Member shall file the request for the administrative adjustment on behalf of the Members. If such consent is not obtained within 30 days from such notice, or within the period required to timely file the request for administrative adjustment, if shorter, any Member, including the Tax Matters Member, may file a request for administrative adjustment on its own behalf. Any Member intending to file a petition under Code Sections 6226, 6228 or other Code Section with respect to any item involving the Company shall notify the other Members of such intention and the nature of the contemplated proceeding. If the Tax Matters Member is the Member intending to file such petition on behalf of the Company, such notice shall be given within a reasonable period of time to allow the other Members to participate in the choosing of the forum in which such petition will be filed.

(e)     If any Member intends to file a notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the Company and the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

## ARTICLE 8
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

9.01    **Maintenance of Books.** The Manager shall keep or cause to be kept at the principal office of the Company (or at a designated location of a representative of his choosing with notice provided to all Members of the location), complete and accurate books and records of the Company, supporting documentation of the transactions with respect to the conduct of the Company's business and minutes of the proceedings of the Manager and the Members. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company; a copy of the Articles and this Agreement and all amendments thereto; a current list of the names and last known business, residence, or mailing addresses of all Members; the number and type of Membership Interests held by each Member if applicable; and the Company's federal, state, and local tax returns for the Company's six most recent tax years.

9.02    **Reports.** On or before the 90th day following the end of each fiscal year during the existence of the Company, the Manager shall cause the Members to be furnished with a balance sheet, an income statement, and a statement of changes in Member's capital of the Company for, or as of the end of, that year certified by a recognized firm of certified public accountants. These financial statements must be prepared in accordance with generally accepted accounting principles and must be accompanied by a report of a certified public accountant certifying the statements and stating that (a) their examination was made in accordance with generally accepted auditing standards and, in their opinion, the financial statements fairly present the financial position, financial results of operations, and changes in the Members' capital in accordance with accounting principles employed for accrual basis records consistently applied (except as therein noted) and (b) in making the examination and reporting on the financial statements described above, nothing came to their attention that caused them to believe that (i) the income and revenues were not paid or credited in accordance with the financial and



29

accounting provisions of this Agreement, (ii) the costs and expenses were not charged in accordance with the financial and accounting provisions of this Agreement, or if they do conclude that the Manager or Members so failed, specifying the nature and period of existence of the failure. The Manager also may cause to be prepared or delivered such other reports as they may deem appropriate. The Company shall bear the costs of all these reports.

For quarterly accounting purposes, the Managers shall have prepared detailed quarterly profit and loss statements within 30 days after the last day of each quarter.

8.03 **Accounts.** The Manager shall establish one or more separate bank and investment accounts and arrangements for the Company, which shall be maintained in the Company's name with financial institutions and firms that the Manager determines. The Manager may not commingle the Company's funds with the funds of any Member. MKC shall have access to the account and for check writing authority and purposes as necessary to operate in the ordinary course of business.

## ARTICLE 10
## DISPUTE RESOLUTION

10.01 **Arbitration.** Except as explicitly provided for otherwise herein, any controversy or claim arising under or in connection with this Agreement, or in connection with the validity, construction, performance, or purported breach of this Agreement, or in connection with the subject matter of this Agreement, shall be resolved by final, binding, and non-appealable arbitration conducted by a single arbitrator who shall be a retired judge mutually selected by the parties to the dispute and administered by JAMS in the city of New York, NY, all in accordance with JAMS Streamlined Arbitration Rules and Procedures (the "Rules"), as they may be amended and in effect at the time the arbitration is filed, regardless of the amount in dispute, and judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof. To be clear, without limiting the previous sentence, the arbitration shall be commenced and the arbitrator shall be chosen in accordance with the procedures set forth in the [Rules], which are incorporated herein and made a part of this Agreement by reference. The parties agree to accept service of process in accordance with the [Rules]. Further, the parties agree to abide by and perform any award rendered in any such arbitration, and agree that any court having jurisdiction over them may issue a judgment based upon the award. The prevailing party in any arbitration shall be entitled to reimbursement of all costs of the arbitration, including but not limited to filing fees and expenses, arbitrator fees and expenses, and reasonable attorneys' fees and expenses, subject to approval by the arbitrator.

## ARTICLE 11
## DISSOLUTION, WINDING-UP AND TERMINATION

11.01 **Dissolution.** The Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "**Dissolution Event**"):
    (a)    a unanimous consent deciding such dissolution and winding-up; and
    (b)    any other event causing dissolution required by the Act.

11.02 **Winding-Up and Termination.** On the occurrence of a Dissolution Event, the Manager shall act as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of winding up shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company with all of the power and authority of the Manager. The liquidator shall:

(a)     cause, as promptly as possible after dissolution and again after final winding up, a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable;

(b)     cause the notice to be mailed to each known creditor of and claimant against the Company;

(c)     pay, satisfy or discharge or make adequate provisions to satisfy from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up and any advances described in Section 3.09); and

(d)     all remaining assets of the Company shall be distributed to the Members as follows:

(i)     the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members in accordance with the provisions of Section 6.05;

(ii)     with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members in accordance with Section 6.04 as a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)     Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 days after the date of the liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 11.02. The distribution of cash and/or property to a Member in accordance with the provisions of this Section 11.02 constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member and constitutes a compromise to which all Members have consented within the meaning of Section 608.444 of the Act. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

11.03 **Deficit Capital Accounts.** No Member will be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

10.04 **Articles of Dissolution.** Upon the occurrence of a Dissolution Event, the Manager (or such other Person or Persons as the Act may require or permit) shall file a statement

of intent to dissolve with the New York Department of State. On completion of the distribution of Company assets, the Manager (or such other Person or Persons as the Act may require or permit) shall file Articles of Dissolution with the New York Department of State.

## ARTICLE 12
## TAG ALONG AND RIGHT OF FIRST REFUSAL PROVISIONS

12.01 **Tag-Along Provisions.** Subject to the occurrence of a removal event under Section 3.12, the exercise of a Special Purchase Right pursuant to Section 4.5 (or the occurrence of the event triggering such Special Purchase Right) and/or the occurrence of a Sale Transaction triggering the exercise of the drag along right pursuant to Section 4.7, and notwithstanding anything to the contrary contained herein, except for permitted transfers to an Affiliate, none of the Members, or any of their respective Affiliates to which they may have transferred and/or through which they may own their Membership Interests, may transfer their Membership Interests to any other Person (a "**Covered Transfer**") or entity without complying with the terms set forth in this Section 12.01.

(a) such Members (the "**Covered Transferor**") shall give not less than 30 days prior written notice of a Covered Transfer to each Member. Such notice (a "**Participating Notice**") shall set forth the terms and conditions of such Covered Transfer, including the name of the prospective transferee, the number of Units proposed to be transferred (the "**Participation Securities**") by the Transferor, the percentage of the total number of Units held by the Covered Transferor that the Participating Securities constitutes (the "**Tag Along Percentage**"), the purchase price per Unit proposed to be paid therefor, the payment terms and type of transfer to be effectuated and the proposed time and place of closing. Within 20 days following the delivery of the Participation Notice by the Covered Transferor to each Member, each notified Member deciding to participate in such proposed Covered Transfer (each, a "**Participating Offeree**") shall, by notice in writing to the Covered Transferor and to the Company, have the opportunity and the right to sell to the purchasers in the Covered Transfer (upon the same terms and conditions as the Covered Transferor) up to that number of Units, subject to the last sentence of Section 12.01(d) below, as shall equal the product of (A) the Tag Along Percentage and (B) the number of Units owned by such Participating Offeree. The Covered Transferor shall attempt to obtain inclusion in the proposed Covered Transfer of the entire number of Units, which the Covered Transferor and the Participating Offeree desire to have included in the proposed Covered Transfer. In the event the Covered Transferor shall be unable to obtain the inclusion of such entire number of Units in the proposed Covered Transfer, the number of Units to be sold in the Covered Transfer by each Participating Transferee and the Covered Transferor shall be determined in accordance with Section 12.01(d) below. The terms and conditions of any sale pursuant to this Section 12.01 shall be the same as set forth in the Participation Notice, except that the actual date of the closing of any proposed Covered Transfer may change.

(b) At the closing of any proposed Covered Transfer in respect of which a Participation Notice has been delivered, the Covered Transferor, together with all Participating Offerees, shall deliver to the proposed transferee certificates evidencing the Units to be sold thereto duly endorsed and shall receive in exchange therefor the consideration to be paid or delivered by the proposed transferee in respect of such Units as described in the Participation Notice.

(c) In the event the Covered Transferor under this Section 12.01 fails to complete the proposed transfer within 90 days from the date of the Participation Notice, in order

to complete a Covered Transfer after such 90-day period, the Covered Transferor must separately comply with this Section 12.01.

(d) The acceptance of each Participating Offeree shall be irrevocable except as hereinafter provided, and each such Participating Offeree shall be bound and obligated to sell, on the same terms and conditions as the Covered Transferor specified in the Participation Notice, such number of Units as specified in such Participating Offeree's written commitment. In particular, the Participating Offerees shall be required (i) to make the same representations, warranties, covenants, indemnities and agreements the Covered Transferor agrees to make in connection with the proposed Covered Transfer as applicable to such Members and (ii) to bear a pro rata portion of the costs incurred by the Covered Transferor, and it shall be a material breach of this Agreement not to do so in a reasonably timely manner (as dictated by the requirements of the Covered Transfer). In the event the Covered Transferor shall be unable to obtain the inclusion in the sale of all Units which the Covered Transferor and each Participating Offeree desires to have included in the sale, the number of Units to be sold in the sale be the Covered Transferor and each Participating Offeree shall be reduced on a pro rata basis according to the proportion which the number of Units which each such party desires to have included in the sale bears to the total number of Units desired by all such parties to have included in the sale.

**12.02 Right of First Refusal.** Subject to the provisions of Section 3.7 and to the terms and conditions contained in this Section 12.02, the Company hereby grants to each Member the right of first refusal to purchase such Member's pro rata share of any additional Units which the Company may, from time to time, propose to issue and sell.

(a) <u>Notice of Right</u>. In the event the Company proposes to undertake an issuance of new Units, it shall give each Member written notice of its intention, describing the price and terms upon which the Company proposes to issue the same. Each Member shall have 20 days from the date of delivery of such notice to agree to purchase up to such Member's pro rata share of such new Units, for the price and upon the terms specified in the notice, by delivering written notice to the Company and stating therein the quantity of the new Units to be purchased.

(b) <u>Right of Over-Allotment</u>. In the event that the Members fail to fully exercise the right of first refusal within such 20 day period, each Member fully exercising its right of first refusal may purchase, on a pro rata basis, the non-purchasing Members' or Member's pro rata share. The Company will promptly notify those Members fully exercising their rights of first refusal, in writing, of the availability of additional new Units, and each of the fully-exercising Members shall have 10 days from the date of receipt of any such notice to agree to purchase up to such Member's pro rata portion of such new Units.

(c) <u>Lapse and Reinstatement of Rights</u>. The Company shall have 70 days following the 20 day period described in Section 12.02(a) and the additional 10 day period described in Section 12.02(b) to sell or enter into an agreement (pursuant to which the sale of the new Units covered thereby shall be closed, if at all, within 30 days from the date of said agreement) to sell the new Units with respect to which the Investors' right of first refusal was not exercised, at a price and upon terms no more favorable to the purchasers of such Units than specified in the Company's notice. In the event the Company has not sold the new Units or entered into an agreement to sell the new Units within such 70 day period (or sold and issued the new Units in accordance with the foregoing within 30 days from the date of said agreement), the Company shall not thereafter issue or sell any new Units without first offering such Units to the Members in the manner described above.



33

(d)  <u>Assignment of Right of First Refusal</u>.  The right of first refusal granted hereunder may not be assigned or transferred except from each Member to an Affiliate of each Member.

## ARTICLE 13
## GENERAL PROVISIONS

13.02  **Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

13.03  **Notices and Meetings.** All notices, requests or consents required or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail or by facsimile or similar transmission or via email (with consent to email); and a notice, request or consent given under this Agreement is effective on receipt by the Person intended to receive it. All notices, requests and consents to be sent to a Member must be sent to or made at the addresses (physical address and/or email address) given for that Member on Exhibit "A" or such other address as that Member may specify by notice to the other Members. Any notice, request or consent to the Company or the Manager must be given to the Manager at the address of the Company from time to time designated by the Manager. Whenever any notice is required to be given by law, the Articles or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

The Manager or the Members may call a special meeting of Members by giving at least seven Business Days' notice to each Member. Notices of meetings must state the date, time, place, and purposes of the meeting. The Board of Managers shall meet as necessary as determine by the Manager, but not less than monthly for the first 6 months of operation and not less than quarterly thereafter. Meetings shall be telephonic or in person as determined by the Manager. Board Meetings shall be annually or more frequently as determined by the Manager. The Board of Managers shall keep notes of all its proceedings and a copy of monthly operating statements shall be prepared for all Members and kept on file.

Unless a greater percentage is specified in the Operating Agreement, a unanimous consent must approve any action to be taken by the Members that is considered a major decision. All Members are entitled to vote and Members holding must be present (or represented) at a meeting of Members to constitute a quorum. If a quorum is not present at any meeting, the Manager present may adjourn the meeting to another date, time and place with 24 hours' notice to the Members. At meetings, Members may vote in person or vote by proxy.

Any Member may participate in a meeting by means of conference telephone or other communications equipment that enables all of the participants in the meeting to participate collectively. Such participation will constitute presence in person at the meeting.

In lieu of taking any action at a meeting, the Members may take action if Members (or relevant Members, as the case may be) holding collectively 51% or more of the voting rights (or of the relevant voting rights) in the Company consent to the action in writing.

A Member may waive notice of any meeting either before or after the meeting by providing a written waiver to the Manager. Attendance at a meeting constitutes a waiver of notice of that meeting, except where the attendee (i) objects at the beginning of the meeting to the transaction or business because the meeting is not lawfully called or convened, or (ii) objects before a vote on an item of business because the item may not lawfully be considered at that meeting and does not participate in the consideration of the item at that meeting.

Minutes of meetings, copies of written consents and copies of waivers of notice must be filed with the records of the Company.

13.04 **Entire Agreement.** This Agreement constitutes the entire agreement of the Members relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

13.05 **Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.

13.06 **Amendment or Restatement.** This Agreement may be amended or restated only by a written amendment adopted by a unanimous consent of the Members, and Members shall be provided written copies of any amendments or restatements.

13.07 **Binding Effect.** Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members and their respective successors and assigns.

13.08 **Governing Law; Severability.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Articles, or (b) any mandatory, non-waivable provision of the Act, such provision of the Articles or the Act shall control. If any provision of the Act provides that it may be varied or superseded in an Agreement of a limited liability company or otherwise by agreement of the members or managers, such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same subject matter. If any Provision of this Agreement or its application to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

13.09 **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.



13.10 **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

13.11 **Indemnification.** To the fullest extent permitted by law, each Member shall indemnify and hold harmless the Company, each Manager and each other Member from and against all losses, costs, liabilities, damages, and expenses (including costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

13.12 **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

13.13 **Construction, Sections, Exhibits, Incorporation by Reference.** Unless the context requires otherwise the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine, and neuter. Each reference to a "Section" or "Subsection" or "Article" herein is, unless specifically indicated otherwise, a reference to a section or subsection of this Agreement. Each reference to an "Exhibit" herein is, unless specifically indicated otherwise, a reference to an exhibit attached hereto, all of which are made a part hereof for all purposes, it being understood that if any Exhibit that is to be executed and delivered pursuant to the terms hereof contains blanks, it shall be completed correctly and completely in accordance with the terms and provisions hereof and as contemplated herein prior to or at the time of its execution and delivery. All exhibits, schedules, documents, and instruments referred to in this Agreement are incorporated by reference for all purposes.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

14.01 **Intellectual Property.** The Company is expected to create and utilize certain intellectual property in its restaurant. All intellectual property created for the Company, including but not limited to recipes, menus, cookbooks, formulas, concepts, techniques, slogans, chemical and molecular combinations, and trade secrets ("Materials") shall be considered "work made for hire" (and will be Company's sole property) pursuant to the U.S. Copyright Act, 17 U.S.C. §101 et seq, and any foreign equivalent thereof.

To the extent, if any, that Materials (or any element or component thereof) may not be considered work made for hire, each Member hereby assigns to Company all of his ownership, right, title, and interest in and to all Materials, including, without limitation: (A) all copyrights, patents, trade secrets, and other Intellectual Property rights and all other rights that may hereafter be vested relating to the Materials, arising under U.S. or any other law, together with all national, foreign, state, provincial, and common law registrations, applications for registration, and renewals and extensions thereof; (B) all goodwill associated with Materials; and (C) all benefits, privileges, causes of action, and remedies relating to any of the foregoing, whether before or hereafter accrued (including without limitation the exclusive rights to apply for such registrations, renewals, and/or extensions, to sue for all past infringements or violations of any the foregoing, and to settle and retain proceeds from any such actions). To the extent, if any, that this Section does not provide Company with full ownership, right, title, and interest in and to the

Materials, each Member hereby grants Company a perpetual, irrevocable, fully-paid, royalty-free, worldwide license to reproduce, edit, create derivative works from, distribute, publicly display, publicly perform, use, make, have made, offer for sale, sell or otherwise dispose of, and import the Materials, with the right to sublicense each and every such right.

Each Member acknowledges and agrees that such Member is to have no rights, title, or interests in or to the Materials, or any material containing the Materials or any element or component thereof. All rights granted or agreed to be granted by each Member under this Agreement shall vest in Company automatically and immediately, whether by way of a present assignment of future Intellectual Property rights or otherwise, and shall remain perpetually vested in Company and its successors and assigns, whether this Agreement expires in its normal course, or is terminated in whole or in part by either party for any reason whatsoever. With respect to Inventions that may not be subject to Copyright or Patent laws, Company shall have all rights whatsoever, including international priority rights, in and to all Inventions that each Member conceives, develops, or reduces to practice, or causes to be conceived, developed or reduced to practice, during the term of this Agreement, except, as provided for in the California Labor Code, or any comparable law where each Member performs services outside of California.

To the extent applicable, each Member waives any so called "Moral Rights" or "droit moral". Company shall have fully discharged Company's obligations hereunder by exchanging proper consideration for such rights. Each Member agrees and understands that compliance with the covenants and agreements contained in this Section is not conditioned upon the payment of any additional or special consideration. The obligations of this Section shall continue beyond the termination of this Agreement in perpetuity, and shall be binding upon each Member's successors, executors, administrators, and other legal representatives.

14.02 **Further Actions; Power of Attorney.** Each Member will, without charge but at Company's expense, promptly execute and deliver such applications, assignments, descriptions and other instruments as Company may consider reasonable necessary or proper to vest title to any such inventions, discoveries, improvements, technical information, patent applications, patents, copyrightable work or reissues thereof in Company and to enable it to obtain and maintain the entire worldwide right and title thereto. Each Member hereby irrevocably appoints Company as that Member's attorney for purposes of effectuating the acts contemplated in this Section 13.

14.03 **Retained Rights.** Notwithstanding any other provision of this Section, all intellectual property, including but not limited to recipes, menus, trademarks, cookbooks, formulas, concepts, techniques, slogans, chemical and molecular combinations, and trade secrets used for the benefit of the Company, created by MK Cuisine Global LLC or Matthew Kenney or owned by any of Matthew Kenney's related affiliates or entities prior to the date of this Agreement and used for the benefit of the Company, shall remain the property of Matthew Kenney or a Matthew Kenney related entity, as the case may be; and shall be licensed to the Company for $1.00 per year. If MK Cuisine Global, Matthew Kenney or a Matthew Kenney related entity sells its interest, or is completely divested of any interest, the Company shall be entitled to use all "materials" that MK Cuisine Global or Matthew Kenney contributed to the Company up to the day of the sale, and shall be able to use the materials on an ongoing basis.

All intellectual property, including but not limited to recipes, menus, trademarks, cookbooks, formulas, concepts, techniques, slogans, chemical and molecular combinations, and trade secrets created by an MK Cuisine Global LLC owned entity or other Matthew Kenney entity or Matthew Kenney and not specifically designated for use for the benefit of the Company or used by the Company shall remain the property of MK Cuisine Global LLC, Matthew Kenney or a Matthew Kenney related entity, as the case may be.

IN WITNESS WHEREOF, the undersigned parties have adopted and executed this Agreement as of the Effective Date first set forth above.

**MANAGER:**

By: ~~Khalil Saliba~~ RAYMOND AZZi

Signature: _____

Date of Execution: 11 - 11 - 2015

**MANAGEMENT GROUP**

MKC Management Group LLC, by Matthew Kenney, its manager

Signature: _____

Date of Execution: 11 - 11 - 15 .

**MEMBERS:**

By:     MK Cuisine Global LLC, by Matthew Kenney, its manager

Signature: _____

Date of Execution: 11 - 11 - 15

By: Raymond Azzi

Signature: _____

Date of Execution: 11 - 11 - 2015

By: Khalil Saliba

Signature: _____

Date of Execution: 11 11 2015

38

| Name of Member | Contribution | Units | Percent Interest |
|---|---|---|---|
| Raymond Azzi _R A 50 000_ | $100,000.00 [3] | 33.34 | 33.34%[2] |
| MK Cuisine Global LLC[4] | $0.00 | 33.33 | 33.33% |
| Khalil Saliba _KS 50 000_ | $100,000.00 | 33.33 | 33.33% |
| TOTAL | $200,000.00 | 100 | 100.000% |

_R A $100,000_

---

[1] To be updated and finalized within 60 days of opening to the restaurant to the public.

[2] If, in year one, $30,000.00 is not assigned by MK Cuisine Global LLC to Raymond Azzi through MK Cuisine Global LLC's share of Net Profits, and at the end of year two, the remaining $70,000.00 is not assigned by MK Cuisine Global LLC to Raymond Azzi through MK Cuisine Global LLC's share of Net Profits, MK Cuisine Global LLC has the option of paying the total remaining balance owed by MK Cuisine Global LLC by the end of year two to Raymond Azzi, or MK Cuisine Global LLC has the option of assigning all of their units to Raymond Azzi for $1.00 and MKC Management Group LLC shall be removed as the provider of management services at the option of Raymond Azzi and Khalil Saliba. All intentions to be made in writing within 30 days following the end of year two.

3 If, after six months of opening, the $100,000 in construction expenses have not been paid back to Ray Azzi and Khalil Saliba from Net Profits, then the Company has the option of procuring a loan to reimburse the $100,000.00, so long as Matthew Kenney or MK Cuisine Global LLC is not required to be a guarantor of the loan, and the loan plus reasonable rate interest will be paid by the Company.

4MK Cuisine Global LLC is providing its management company, MKC Management Group LLC, as consideration for services in exchange for equity and the management fee.